IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2017 MAR 13  PM 4: 38

DEPUTY CLERK_____

| | | |
|---|---|---|
| SASHA NAVARETTE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:15-CV-256 |
| | § | |
| NANCY A. BERRYHILL, | § | |
| Acting Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION
## TO AFFIRM THE DECISION OF THE COMMISSIONER

Plaintiff Sasha Navarette brings this cause of action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of defendant NANCY A. BERRYHILL, Acting Commissioner of Social Security (Commissioner), denying plaintiff's application for disability insurance benefits (DIB) and Social Security Income benefits (SSI). For the reasons hereinafter expressed, the undersigned United States Magistrate Judge recommends the Commissioner's decision finding plaintiff not disabled and not entitled to benefits be AFFIRMED.

I.
THE RECORD

Plaintiff filed an application for DIB and SSI on November 2, 2011, alleging a disability onset date of October 1, 2011. (Tr. 13, 115–24, 135, 139). Plaintiff's claim was denied initially and on rehearing. Plaintiff requested an administrative hearing, which was held January 3, 2014.

(Tr. 31–56, 65–70, 74–77).  The ALJ issued an unfavorable decision on March 19, 2014, finding

plaintiff not disabled.  (Tr. 13–25).   The ALJ found plaintiff had the following severe

impairments: lupus nephritis, systemic lupus erythematosus, obesity, and rheumatoid arthritis.

(Tr. 15–16).  He determined none of plaintiff's impairments met or equaled the severity of a

listed impairment.  (Tr. 16).  The ALJ next evaluated plaintiff's RFC, reaching the conclusion

plaintiff was able to "lift or carry, push or pull ten pounds occasionally and less than ten pounds

frequently.  She can sit for six hours out of an eight-hour day, and stand or walk a combined total

of two hours out of an eight-hour day.  The claimant is occasionally able to climb ramps or stairs,

but is unable to climb ladders, ropes, or scaffolds.  The claimant is unable to tolerate exposure to

hazards." (*Id.*).  The ALJ found plaintiff was able to perform her past relevant work as medical

clerk.  (Tr. 23).

    Upon the Appeals Council's denial of plaintiff's request for review on June 19, 2015, the

ALJ's determination that plaintiff was not under a disability during the relevant time period

became the final decision of the Commissioner.  (Tr. 1–5, 10–25).  Plaintiff now seeks judicial

review of the denial of benefits pursuant to 42 U.S.C. § 405(g).

    The medical records show the following:

    Plaintiff received primary care from Perryton Health Center, where she was seen by

Jennifer McGaughy, M.D., and occasionally was seen by a Physician's Assistant.  (Tr. 227–48).

On February 21, 2011, plaintiff reported her big toe was numb and she had bruising on her left

breast after an incident involving someone throwing a stool.  (Tr. 227).  In April 2011, plaintiff

was seen for a sore throat and diagnosed with strep pharyngitis.  (Tr. 248).  On August 18, 2011,

plaintiff presented with blisters on the roof of her mouth, which resolved with treatment.  (Tr.

246).  Dr. McGaughy contacted Constantine Saadeh, MD, plaintiff's rheumatologist to determine if her medication should be adjusted.  (*Id.*).  A chest x-ray was ordered on October 4, 2011, when plaintiff presented with shortness of breath and a history of lupus.  (Tr. 41).  No acute cardiopulmonary abnormalities were noted.  (*Id.*).  On March 9, 2012, plaintiff was seen for a follow up from increased abdominal pain over two weeks.  (Tr. 244).  Plaintiff had cut out spicy food and taken Nexium, and the gastritis pain was improving.  (*Id.*).  On March 16, 2012, plaintiff was seen for eye pain and redness, and was referred to J.A. Rush, M.D., P.A.  (Tr. 243).

Plaintiff had extensive treatment by Constantine Saadeh, M.D., F.A.C.P., who was her rheumatologist.  On February 20, 2010, Plaintiff was initially seen by Dr. Saadeh and reported being diagnosed with lupus in August 2009.  (Tr. 251–54).  Plaintiff reported developing a rash on her face and being concerned about her kidneys as she was experiencing pain.  (*Id.*).  She was taking prednisone for the rash.  (*Id.*).  She reported experiencing pain in the joints of her fingers, hands, wrists, elbows, knees, ankles, feet, and toes.  (*Id.*).  Dr. Saadeh's plan was for plaintiff to continue plaquenil, wean off the prednisone, and obtain x-rays and an ultrasound.  An x-ray of her hands and feet was ordered and showed juxtarticular osteopenia across the metacarpalphalangeals (MCPs) and the carpal bones showed soft tissue swelling and cystic changes were noted over the capitate on the right.  (Tr. 255–57).  Dr. Saadeh noted this was consistent with inflammatory arthritis.  (*Id.*).  X-rays of the ankles and feet showed no evidence of calcaneal spurs, but there was juxtarticular osteopenia and soft tissue swelling across the metatarsophalangeals (MTPs) with cystic changes noted over the first MTP bilaterally.  (*Id.*).  Dr. Saadeh again noted these findings were consistent with inflammatory arthropathy.  (*Id.*).  X-rays of the hips were taken on March 31, 2010, with normal results indicated.  (Tr. 273).

On June 15, 2010, plaintiff was seen by Dr. Saadeh and reported doing great. (Tr. 283). Plaintiff had run out of the methotrexate protocol (MTX) that she had started in the past, and plaintiff noted an improvement in fatigue and pain after stopping the medication. (*Id.*).

On October 11, 2010, plaintiff returned to Dr. Saadeh complaining of recurrence of lesions and mild right arm and hand pain. (Tr. 287–88). Dr. Saadeh had plaintiff restart the MTX, folic acid, and plaquenil. (*Id.*).

On March 7, 2011, plaintiff presented with complaints of her right big toe being numb, left hip/groin pain, and headaches. (Tr. 292–95). The history of present illness section states that plaintiff has not tolerated MTX or plaquenil well, stating "Plaquenil caused dizziness and MTX caused severe depression per pt." (*Id.*). Plaintiff requested to start medications again due to increased joint pain and psoriasis lesions. (*Id.*). Plaintiff was to start Humira injections. (*Id.*).

Ten days later, plaintiff was seen again for a follow-up and reported no improvement on Humira. (Tr. 302–04). Plaintiff reported pain in all joints bilaterally, except her shoulders. (*Id.*). She also stated she may need to be on disability. (*Id.*). Patient still had psoriasis lesions, but they were only on her ears at that point and no other area. (*Id.*). She was to continue the Humira for 12 weeks and add Cutivate and Bactroban to treat the lesions. (*Id.*). She also received a prescription for Tramadol as needed for pain. (*Id.*). On June 27, plaintiff returned for a follow up. (Tr. 308–12). Plaintiff did not feel the Humira was working and still had unbearable headaches, pain in bilateral hands, hips, and thighs, and in the right wrist and first two fingers. (*Id.*). An ultrasound was done and did show active disease, mostly along the MCPs and wrists. (*Id.*). Plaintiff was started on MTX again. (*Id.*).

On August 31, 2011, plaintiff presented with continued complaints of pain in the back of her head and joints. (Tr. 332–36). The impression upon examination and review of a bilateral hip x-ray that was ordered was: a history of lupus, lupus induced tenosynovitis, knee pain, abnormal liver test, mouth herpes, and a history of inflammatory arthropathy. (*Id.*). Plaintiff was restarted on Plaquenil and started on Imuran. (*Id.*).

On September 12, 2011, plaintiff returned and reported having no joint pain and feeling better after the IV Solu-Medrol. (Tr. 341–43). Plaintiff was to continue treatment. (*Id.*). On October 11, 2011, a right renal biopsy was performed and showed lupas nephritis, predominantly stage II. (Tr. 354–66).

On November 1, 2011, plaintiff returned complaining of running a low grade temp for the last week, fatigue, "all over joint pain," and that pain pills were making her sick and she wanted something that would make her "feel good . . . like 5 Tylenols do." (Tr. 378–81). She also reported swelling in her hands, pain in her right hip and left knee, and her left arm was hurting and felt like she was having a heart attack. (*Id.*). The chest pain was determined to be consistent with osteoarthritis, while plaintiff's other increased symptoms were attributed to a flare up of her lupus. (*Id.*). Plaintiff had worsening protein excretion. (*Id.*). Plaintiff was to continue Solu-Medrol, Lasix, and start CellCept to control her kidney process. (*Id.*).

Dr. Saadeh started plaintiff on Cytoxan and she received infusions on November 10, 2011, November 29, 2011, December 13, 2011, December 27, 2011, January 17, 2012, February 16, 2012, March 20, 2012, April 10, 2012, and May 3, 2012. (Tr. 412, 421, 427431–32, 447–48, 465–66, 484–85, 488–89, 493–94). Plaintiff showed general improvement, reporting on

November 14, 2011, her joint pain was better and there was no tenderness or swelling. (Tr. 414–16). She was experiencing nausea, so Phenergan was ordered. (*Id.*). Another follow-up exam was conducted December 1, 2011, and plaintiff reported her joint pain was good. (Tr. 425–26). She was having some knee pain, but she used Volteran gel and it helped. (*Id.*).

On February 8, 2012, plaintiff was seen and stated she had no complaints at that time. (Tr. 459–61). She reported that she had not been feeling bad and was frustrated with her lab results, which had been showing her white blood cell counts were not at a therapeutic level. (*Id.*). She denied any complaints of joint pain or morning stiffness. (*Id.*).

On February 29, 2012, plaintiff was seen presenting with diarrhea, nausea, congestion, and stomach ache. (Tr. 471–72). Plaintiff stated she didn't want to see her PCP for it, so she waited for this appointment. (*Id.*). She needed to obtain lab work to see if she needed Neupogen, as another injection of Cytoxan was scheduled. (*Id.*). Plaintiff had a full range of motion of the spine, shoulders, elbows, and wrists, but did have sinus tenderness on exam. (*Id.*). Her white blood cell count was very low at 1.6. (*Id.*). She was diagnosed with lupus nephritis, sinusitis, and chronic neutropenia secondary to Cytoxan. (*Id.*).

Plaintiff had to discontinue Cytoxan due to a urinary tract infection. (Tr. 616–18, 628–30). She received a shot of Rocephin and a urology consult was ordered. (*Id.*).

On May 30, 2012, plaintiff reported feeling much better, not having difficulties, and medications were working well. (Tr. 632–35). She reported increased energy level and overall feeling much improved. (*Id.*). The plan was to repeat lupus labs in one month and restart Cytoxan before that time if plaintiff was released from urologist. (*Id.*).

On June 27, 2012, plaintiff reported doing better, other than some continuing issues with

the urinary tract infection and treatment with a urologist. (Tr. 636–39).

On October 3, 2012, plaintiff reported feeling bad and having headaches. (Tr. 657–59). She reported that Zofran and Cymbalta were not working for her. (*Id.*). The note states plaintiff will be switched from Cymbalta to Lexapro for depression. (*Id.*).

On January 9, 2013, plaintiff was seen for cough, congestion, and drainage for three weeks, even after two rounds of antibiotics. (Tr. 662–63). Plaintiff reported having no other concerns at that time. (*Id.*). On January 28, 2013, plaintiff was seen complaining of body aches, productive cough, right ear pain, and fever. (Tr. 664–66). She was diagnosed with Influenza A, acute sinusitis, and asthmatic bronchitis. (*Id.*).

On February 6, 2013, plaintiff was seen again with right ear drainage, stuffy nose, sinus pressure/headache, and a minimal dry cough. (Tr. 666–68). She was prescribed several medications for the sinusitis post influenza. (*Id.*). In two weeks if plaintiff was doing well, she would have a lupus profile done with 24-hour urine and the results of that would determine whether she needed to be put back on Cytoxan. (*Id.*).

On June 3, 2013, plaintiff was seen and had been seeing improvement and getting more active but due to finances had been taking only half doses of her medication. (Tr. 670–77). She had also stopped the Cytoxan infusions due to the cost. (*Id.*). She reported no depression, anxiety, or agitation and her judgment and insight were intact. (*Id.*). She had some tenderness on her wrists bilaterally and hips bilaterally. (*Id.*). Her lupus nephritis was improved, as was her systemic lupus erythematosus. (*Id.*). In the Impression and Recommendations, it was noted that plaintiff was not having any problems with her joints at that time, and psoriasis was not active. (*Id.*). She appeared to be responding to treatment. (*Id.*). The note also indicates that there is no

further need for intervention for her lupus nephritis at that time. (*Id.*). It stated they would try to get her on an assistance program to help her afford her CellCept. (*Id.*). That section concluded by stating, "In general, the patient should benefit from disability and this would help in terms of controlling her disease process." (*Id.*).

On September 6, 2012, Dr. McGaughy provided a letter stating that she was plaintiff's primary care provider, but plaintiff saw three other specialists. (Tr. 650). She stated plaintiff has diagnoses of Systemic Lupus Erythematosis, Lupus Nephritis, Rheumatoid Arthritis, and Psoriasis. (*Id.*). She stated plaintiff could sit, stand, walk, lift, carry, handle objects, hear, speak and travel, but plaintiff is frequently sick with lupus exacerbations and cannot reliably work. (*Id.*). She stated plaintiff has injections every four weeks and gets very ill for several days afterwards and would have excessive absences. (*Id.*). She also stated she did not have any recent treatment notes, discharge summaries, or histories, and that plaintiff had not had labs or x-rays done with Dr. McGaughy in the last two years as plaintiff's specialist primarily ordered labs and imaging. (*Id.*).

On July 16, 2012, Robin Rosenstock, M.D., performed a physical residual functional capacity assessment. (Tr. 598–605). Dr. Rosenstock found plaintiff could occasionally lift and or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk for a total of 6 hours in an 8-hour workday, sit with normal breaks for 6 hours in an 8-hour workday, push and/or pull an unlimited amount. (*Id.*). On September 12, 2012, Hajra Madani, M.D., performed a case assessment of the RFC evaluation by Dr. Rosenstock, and affirmed the findings. (Tr. 651).

II.

STANDARD OF REVIEW

In reviewing disability determinations by the Commissioner, this Court's role is limited to determining whether substantial evidence exists in the record, considered as a whole, to support the Commissioner's factual findings, and whether any errors of law were made. *Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989). Substantial evidence is "such relevant evidence as a responsible mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). To determine whether substantial evidence of disability exists, the following elements must be weighed: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). If the Commissioner's findings are supported by substantial evidence, they are conclusive, and the reviewing court may not substitute its own judgment for that of the Commissioner, even if the court determines the evidence preponderates toward a different finding. *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980). Conflicts in the evidence are to be resolved by the Commissioner, not the courts, *Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir. 1977), and only a "conspicuous absence of credible choices" or "no contrary medical evidence" will produce a finding of no substantial evidence. *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Stated differently, the level of review is not *de novo*. The fact that the ALJ *could* have found plaintiff to be disabled is not the issue. The ALJ did not do this, and the case comes to federal court with the issue being limited to whether there was substantial evidence to support the ALJ's decision.

III.
ISSUES

Plaintiff raises four grounds for reversal of the acting Commissioner's decision denying plaintiff Social Security benefits:

1.   Did the ALJ give proper weight to the opinion of the treating physician?

2.   Did the ALJ treat the diagnosed medical conditions properly in that they are incurable?

3.   Did the ALJ treat the diagnosed medical conditions properly in that they are degenerative?

4.   Did the ALJ properly consider depression as it relates to her medical conditions?

IV.
MERITS

*A.   The ALJ gave appropriate weight to the medical opinions in the record.*

Plaintiff first alleges that proper weight was not given to the opinion of the treating physicians. Pl.'s Br. at 2. Specifically, plaintiff points to Dr. Saadeh's statement that the plaintiff would benefit from disability and it would help control her disease process. (*Id.*). Next, plaintiff looks to the letter provided by Dr. McGaughy, in which she wrote that plaintiff cannot reliably work and gets very ill when she receives her medication. (*Id.*). Plaintiff asserts the ALJ instead relied heavily on the opinions of the state agency consultants, Dr. Rosenstock and Dr. Hajra. (*Id.*).

The opinion and diagnosis of a treating physician is generally entitled to considerable weight in determining disability, but "the ALJ has sole responsibility for determining a claimant's disability status." *Newton v. Apfel*, 209 F. 3d 448, 455 (5th Cir. 2000). When good cause is shown, such as the statements are "brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence," "less weight, little weight, or even no weight may be given to the physician's testimony. *Perez v. Barnhart*, 415 F. 3d 457, 465–66 (5th Cir. 2005). The ALJ has the ultimate responsibility to evaluate plaintiff RFC based on the record as a whole. *See Villa v. Sullivan*, 895 F.2d 1019, 1023–24 (5th Cir. 1990); 20 C.F.R. § 404.1527 (stating opinions from medical sources that a claimant is "disabled" or "unable to work" are "opinions on issues reserved to the Commissioner because they are administrative findings dispositive of a case" and are "not treated as medical opinions as described in paragraph (a)(2).").

Dr. Saadeh was plaintiff's treating rheumatologist. His records support the ALJ's finding. In the last note from Dr. Saadeh, he notes plaintiff reported being more active, having improvement in her activities of daily living, not having any problems with her joints, her psoriasis was not active, her lupus arthritis was responding to treatment, and her lupus nephritis required no further treatment at that time. (*See* Tr. 669–77). He did state, "In general, the patient should benefit from disability" but offered no functional limitations or support for that statement. (*See* Tr. 675). Indeed, the records of Dr. Saadeh generally support the ALJ's finding that plaintiff could do sedentary work. The ALJ noted that plaintiff had not received treatment from Dr. Saadeh from June 2013 to the time of the opinion in March 2014.

The note written by Dr. McGaughy stating she "cannot reliably hold down a job," is conclusory and not supported by the evidence. (Tr. 650). Further, Dr. McGaughy was not plaintiff's primary provider who was treating the severe impairments allegedly causing plaintiff to be unable to work. Dr. McGaughy treated plaintiff primarily for issues such as strep throat, gastritis, and other general conditions. Even in Dr. McGaughy's September 6, 2012 letter, she stated she had no recent treatment records and no labs or imaging to provide. (*Id.*). The ALJ noted that plaintiff had not been seen by Dr. McGaughy since March 2012, when she wrote her letter stating plaintiff could not reliably work. (Tr. 22). And other than her statement that plaintiff would not be reliable, she stated plaintiff could lift, walk, sit, travel, etc., with no limitations. The ALJ provided adequate support for giving little weight to the opinion of Dr. McGaughy that plaintiff could not reliably work and actually set forth an RFC with greater functional limitations than Dr. McGaughy provided.

Plaintiff next argues that the ALJ relied heavily on the opinions of the state agency physicians. This, however, is in contradiction from the opinion of the ALJ. In fact, the ALJ specifically stated, "The State agency medical opinions are given little weight, as the various complaints throughout the record would limit her to sedentary work. . . . [rather than their opinion that] claimant could perform at the full level of light exertion." (Tr. 23).

The ALJ is not bound by a treating physician's opinion that a claimant cannot return to their past work when the weight of the medical evidence and the functional assessments contained in the record support the ALJ's RFC determination.  *See* 20 C.F.R. § 404.1527.

In the present case, the ALJ appropriately explained the weight given to the medical opinions contained in the record, and substantial evidence supported his RFC determination.

B.  *The ALJ properly considered plaintiff's severe medical conditions.*

The Court will consider plaintiff's second and third issues together as they both question whether the ALJ properly considered plaintiff's severe medical conditions.

Plaintiff first questions whether the ALJ properly considered plaintiff's conditions as incurable, citing *Web MD* and *News-Medical.net* as sources for the premise that treatment reduces the progression of lupus nephritis and rheumatoid arthritis but does not cure them.  Pl.'s Br. at 3.  Plaintiff provides no citation or argument as to how the ALJ did not properly consider these severe impairments or what the ALJ should have done differently.

Plaintiff next asserts the ALJ did not treat plaintiff's severe impairments as progressive, citing the same websites for the premise that these conditions worsen over time.  (*Id.*).  Again, plaintiff provides no further argument detailing in what manner the ALJ erred in his assessment of plaintiff's severe impairments.

The Commissioner does not dispute that plaintiff's conditions are incurable or progressive, but argues these assertions are irrelevant.  Def.'s Br., ECF No. 17, at 7.  The Commissioner asserts the relevant time period is from the alleged date of onset, October 1, 2011, through the date of the ALJ's decision, March 19, 2014.  (*Id.*).  The Commissioner correctly cites to *Johnson v. Heckler*, 767 F.2d 180, 186 (5th Cir. 1985), for the proposition that evidence after the point of adjudication is at best "evidence of a later-acquired disability or the subsequent deterioration of the previously non-disabling condition" and does not justify remand.

There is little doubt from the records and testimony that plaintiff experiences pain, but the presence of pain is not always disabling.  *See Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) (mild or moderate pain will not render a claimant disabled); *Richardson v. Bowen*, 807 F.2d 444,

448 (5th Cir. 1987) ("While pain can be a disabling condition, not all pain is disabling. [Plaintiff's] allegations of pain are to be evaluated against the other evidence in the record.") (internal citations omitted). Plaintiff's condition may progress to a point where it is considered disabling, but the Court cannot review the ALJ's decision based on what unknown developments may happen after the date of the ALJ's determination.

Substantial evidence supports the ALJ's consideration of plaintiff's severe impairments.

*C. The ALJ's consideration of depression was appropriate.*

Last, plaintiff asserts the ALJ did not properly consider depression in relation to the other conditions. Pl.'s Br., at 3. Plaintiff notes there is a reference to depression in the medical records, citing to Transcript 655, but states depression was not considered. (*Id.*). Plaintiff states, "that depression combined with lupus nephritis, lupus erythematosus, rheumatoid arthritis severely limits Plaintiff's ability to get and maintain employment." (*Id.*).

The Court first notes that plaintiff did not allege depression as a physical or mental condition that limited her ability to work in her application for benefits. (Tr. 139). Specifically in answer to this question she stated, "1. Lupus; 2. RA [rheumatoid arthritis]; 3. Sorosis [psoriasis]." Further, at no point in her testimony at the hearing did she ever mention depression, much less claim it as a disabling impairment. Pl.'s Testimony, (Tr. 36–47).

The fact that plaintiff never alleged depression as a disabling impairment in either her application for benefits or her testimony is significant. Plaintiff cites to one page of a voluminous medical record of over 500 pages for her assertion that she suffered from depression, though the Court notes the medical record cited does not actually reference depression in any context. Pl.'s Br. at 3 (citing Tr. 655). In this Court's review of the medical records, three

notations of depression were found: (1) at Tr. 292–95, a note which stated in the past the MTX had caused severe depression and it was stopped; (2) at Tr. 657–59, the note from Dr. Saadeh states plaintiff had been on Cymbalta for depression, but would be switched to Lexapro; and (3) at Tr. 662–63, in the Diagnosis, it states "3. Depression. Receiving Lexapro."

The ALJ did note in his review of the medical records that plaintiff was on Cymbalta and Lexapro at one point.  (Tr. 20).

The medical record contains entries reflecting plaintiff repeatedly denied depression thereafter.  (See Tr. 664, 667, 672–673).  There are also no references to depression earlier in the medical records, other than those cited above by the Court.

Plaintiff has failed to show that she still suffers from depression, that it is a disabling condition, or in what ways it allegedly limits her.  It was not listed in her application for disability or mentioned in her testimony.  The Commissioner correctly asserts the burden of proof is on the plaintiff in the first four steps of the evaluation process.  *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 2005).

The ALJ considered the record references to depression, but even if he had not, plaintiff failed to meet her burden in showing depression was a severe impairment.

In this case, substantial evidence supports the ALJ's decision.  The Undersigned recommends the case be AFFIRMED.

V.
RECOMMENDATION

It is the RECOMMENDATION of the undersigned United States Magistrate Judge to the United States District Judge that the decision of the defendant Commissioner finding plaintiff

SASHA NAVARETTE not disabled and not entitled to a period of disability benefits be

AFFIRMED.

VI.
INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and

Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this ___/3 th___ day of March 2017.

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

**\* NOTICE OF RIGHT TO OBJECT \***

Any party may object to these proposed findings, conclusions and recommendation.  In the
event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is
fourteen (14) days from the date of filing as indicated by the "entered" date directly above the
signature line.  Service is complete upon mailing, Fed. R. Civ. Petitioner. 5(b)(2)(C), or
transmission by electronic means, Fed. R. Civ. Petitioner. 5(b)(2)(E).  **Any objections must be
filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by
the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. Petitioner. 72(b)(2); *see also* Fed. R. Civ.
Petitioner. 6(defendant).

Any such objections shall be made in a written pleading entitled "Objections to the Report
and Recommendation."  Objecting parties shall file the written objections with the United States
District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely
file written objections to the proposed findings, conclusions, and recommendation contained in this
report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal
the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by
the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United
Services Auto. Ass'n,* 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275,
276-77 (5th Cir. 1988).